IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DONALD LEE McDONALD, | ) | |
|     Plaintiff, | ) | Case No. 09 C 4196 |
| | ) | |
|     v. | ) | Judge Joan B. Gottschall |
| | ) | |
| WEXFORD HEALTH SOURCES, INC., | ) | |
| PARTHASARATHI GHOSH, M.D., and | ) | |
| LIPiNG ZHANG, M.D., | ) | |
|     Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

This case is about a course of medical care provided at Stateville Correctional Center for plaintiff Donald McDonald's high cholesterol and chronic joint pain in his lower back. Defendants Wexford Health Sources, Inc. (the health care provider at Stateville) and two Stateville physicians (Dr. Parthasarathi Ghosh, who was also Stateville's Medical Director at the relevant time, and Dr. Liping Zhang, who provided the bulk of McDonald's medical care) filed a motion for summary judgment pursuant to Fed. R. Civ. P. 56. McDonald, with the assistance of recruited counsel (George Sax and Eric Quandt of Scharf Banks Marmor LLC) submitted a compelling opposition. McDonald also filed a motion to strike portions of the defendants' reply relating to the opinions of defense medical expert Dr. Scott Kale and attaching Dr. Kale's expert report and the transcript of his deposition, contending that the defendants improperly submitted these materials in reply. For the following reasons, McDonald's motion to strike is granted and the defendants' motion for summary judgment is denied in its entirety.

# I. BACKGROUND[1]

## A. The Parties

Plaintiff Donald McDonald has been incarcerated at Stateville Correctional Center since 1995 and is serving a life sentence. Wexford Health Sources is a for-profit company that contracted with the Illinois Department of Corrections ("IDOC") to provide health care services to inmates at Stateville Correctional Center. From 2003 through March 31, 2011, Dr. Ghosh was Stateville's Medical Director. Dr. Zhang worked at Stateville from the Spring of 2008 until 2010, and reported to Dr. Ghosh. During this time, Dr. Ghosh and Dr. Zhang were the only full time Wexford physicians at Stateville.

## B. McDonald's Medical Conditions

McDonald has chronic high cholesterol, which is also known as hyperlipidemia. From late 2007 through 2010, McDonald's lab reports showed that his triglycerides and low-density lipoprotein ("LDL") cholesterol were frequently "high" or "very high." (Lab Reports, Dkt. 174-6.) The record contains materials linking hyperlipidemia with various cardiac problems, including heart disease and stroke.[2]

---

[1] The court acknowledges the defendants' argument that McDonald's statement of additional facts consists of improper compound facts. The basis for this argument is unclear as most of McDonald's additional facts appear as single sentence paragraphs. Where the statements include multiple sentences, they are all clearly interrelated. To the extent that the defendants seek to strike any portion of McDonald's statement of additional facts, their request is denied. In addition, the court notes that the parties filed certain Wexford documents under seal. In this opinion, the court will refer to these materials in general terms.

[2] Although the defendants improperly referred to Dr. Kale's opinions for the first time in reply, the court notes that he has opined that it is unclear if there is a connection between hyperlipidemia and cardiac problems.

Prior to this lawsuit, McDonald was diagnosed with atherosclerosis of the aorta, a clogging of the arteries that must be treated with cholesterol medicine. In addition, he was diagnosed with a narrowing of disc space in his L5-S1 vertebrae. This condition is known as degenerative disc disease, degenerative joint disease, or arthritis of the back.

1.    **Medications Provided to McDonald to Treat his Cholesterol**

The parties agree that generic drugs generally cost less than brand name drugs. Prior to November 30, 2011, Lipitor (atorvastatin) was not available in a generic form. During Dr. Zhang's and Dr. Ghosh's time at Stateville, Lipitor was a non-formulary drug, meaning that it was not available at the Stateville clinic and could not be prescribed unless Dr. Ghosh filled out a form requesting approval of Wexford pharmacy staff. During his deposition, Dr. Ghosh characterized non-formulary drugs as "fancy" and stated that he would not prescribe them unless he had no alternative and had tried formulary treatments without success. (Ghosh Dep., Dkt. 166-3, at 17:11-18:12, 42:10-23).

McDonald claims that Wexford had a policy of treating high cholesterol with a combination of formulary prescription drugs and niacin, a vitamin supplement known to have unpleasant side effects including flushing and pain.[3] He challenges the decision to prescribe the generic drug gemfibrizol (Lopid) and niacin supplements to treat his cholesterol. McDonald believed that this treatment caused him to experience "terrible" side effects, including "itching, burning all over from head to toe, and it was like hot flashes, and it was constant. Once it started there was nothing you could do to stop it." (McDonald Dep., Dkt. 166-1, at 130:9-16;

---

[3] The defendants dispute this fact, stating that McDonald's "redacted citation" and the deposition testimony of Dr. Funk (another Wexford doctor) fails to support this statement. The sealed document cited by McDonald, however, does.

145:9-146:4.) McDonald also believed that the treatment caused him to experience pain in his kidney area.

### 2. McDonald's Interactions with Stateville Physicians

On July 15, 2008, McDonald had his first clinical visit with Dr. Zhang. McDonald contends that he expressed fears about his cholesterol, including concern about his LDL levels and that he suspected that he suffered from atherosclerosis of the aorta and was at risk for further heart problems. He also told Dr. Zhang that he was experiencing painful side effects after taking niacin and gemfibrizol (Lopid) and that the pain in his kidney area and joints that was sometimes so severe that he sometimes could not move for hours. According to McDonald, Dr. Zhang shone a light in his eye, told him that he was imagining feeling pain, and stated that his medications did not cause most people to experience side effects.

Dr. Zhang disputes McDonald's account and states that McDonald did not complain of pain during his appointment. She agrees, however, that she wrote a negative note on McDonald's chart concerning his "noncompliance" with his medication regime. (July 15, 2008 Medical Chart, Dkt. 166-3, at p. 24.) McDonald asserts that he was generally compliant with his prescriptions but it appears that he may not have taken his medications 100% of the time due to side effects.

At his deposition, McDonald testified that immediately after this interaction with Dr. Zhang, he approached Dr. Ghosh in the hallway, said he was upset and having trouble, and asked Dr. Ghosh to intervene. McDonald stated that Dr. Ghosh "bl[ew] me off" and "acted like he didn't want to see me." (McDonald Dep., Doc. 174-8, at 153:4-9.)

Following these interactions, McDonald filed a grievance with IDOC regarding the medical care provided to address his elevated cholesterol and joint pain. After filing the grievance, McDonald saw Dr. Zhang multiple times. He complained of pain, and his medical chart reflects at least two occasions when Dr. Zhang did not prescribe pain relief.

On January 20, 2009, Dr. Zhang acted on McDonald's grievance, stating that he had "received proper care for his hyper lapidarian [sic]. He should improve his compliance to medications." (Grievance Papers, Dkt. 174-1 at p. 4.) Dr. Zhang testified at her deposition that Dr. Ghosh directed this answer. Dr. Ghosh did not recall whether he "helped Dr. Zhang" with this response. (Ghosh Dep., Dkt. 166-2, 51:21-52:1) At his deposition, Dr. Ghosh admitted that Dr. Zhang's response to McDonald's grievance about pain, numbness, and his cholesterol was "an incompetent answer." (*Id*. at 166-2, 50:4-53:4.) McDonald alleges that the response failed to ensure adequate care for him, as required by IDOC's contract with Wexford.

Some of McDonald's laboratory reports – including test results documenting elevated triglycerides and LDL cholesterol – identify Dr. Ghosh as McDonald's "PHYSICIAN." (Lab Reports, Dkt. 174-6.) On March 7, 2009, Dr. Zhang ordered and Dr. Ghosh reviewed and signed a radiologist's x-ray report indicating that McDonald had atherosclerosis of the aorta and a slight narrowing of the L5-S1 disc space, indicating degenerative disc disease. Neither Dr. Zhang nor Dr. Ghosh relayed this information to McDonald (who learned of the findings from another physician more than two years later) or reported it to IDOC or to anyone else.

On March 30, 2009, an IDOC grievance officer recommended denying McDonald's grievance, relying on Dr. Zhang's memorandum. The grievance form states that the officer "has no medical expertise or authority to contradict the doctor's recommendation/diagnosis."

(Grievance Papers, Dkt. 174-8, at p. 3.) On July 13, 2009, McDonald filed a pro se federal court complaint. Among other things, he sought access to treatment with Lipitor (atorvastatin). During Dr. Zhang's tenure at Stateville, neither Dr. Zhang nor Dr. Ghosh prescribed or recommended treatment with Lipitor. In addition, McDonald did not receive physical therapy for his degenerative disc disease.

In July 2010, Wexford terminated Dr. Zhang's employment. In March 2011, Dr. Ghosh left Stateville. He subsequently retired from the practice of medicine.

### 3. Subsequent Treatment

On February 12, 2012, Dr. Nicholas Rizzo (McDonald's expert) examined McDonald at Stateville following his review of McDonald's medical records. Dr. Rizzo personally observed objective symptoms of disc disease in McDonald's lower back, including muscle spasms in his spine and tenderness. Dr. Rizzo made a finding of suboptimal care and recommended that Wexford discontinue niacin, prescribe Lipitor (atorvastatin), discontinue the formulary statin drugs that McDonald was taking, and treat McDonald's degenerative joint disease with physical therapy, heat therapy, and non-steroidal anti-inflammatory drugs (NSAIDs).

In late 2012 and 2013, Wexford changed McDonald's treatment plan, including prescribing atorvastatin for McDonald's high cholesterol.[4] Wexford also provided physical therapy, the NSAID medication Mobic (meloxicam), a double mattress for his cell, and a daily shower permit to allow McDonald to access hot water to treat his lower back. McDonald

---

[4] The defendants deny that McDonald received a Lipitor prescription at this time. However, atorvastatin appears to be the active ingredient in Lipitor, meaning that McDonald received the generic form of Lipitor. *See* Rizzo Dep., Dkt. 174-3, at 58:12-15 ("Atorvastatin. Lipitor is the brand name for atorvastatin."); *see also* http://www.lipitor.com/.

believes that these treatments helped, as his current doctors told him that Lipitor lowered his cholesterol to safer levels and his back is less painful.

In July 2014, Dr. Rizzo signed a letter and subsequently gave a deposition opining that Dr. Zhang and Dr. Ghosh violated the standard of care regarding McDonald's treatment. Dr. Rizzo opined that plaintiff's LDL cholesterol levels were "unacceptably high" because it was "higher than almost any guideline out there" and that Dr. Zhang failed to "provide him with the proper medications, which caused [McDonald] to have side effects." (Rizzo Dep., Doc. 174-3, at 61:4-62:4.) Dr. Rizzo believed that McDonald's "heavy cholesterol plaques" made "the accurate treatment – an appropriate treatment of the LDL – basically imperative." (*Id*. at 64:6-22.)

Specifically, Dr. Rizzo opined that:

- Dr. Zhang's treatment was inadequate.

- McDonald's baseline cholesterol levels without treatment were "atrocious" and required statin therapy.

- Neither Mevacor (a generic statin drug that McDonald was prescribed at some point) nor Lopid (gemfibrizol, a non-statin) were appropriate medications to treat McDonald's cholesterol. Mevacor caused McDonald to experience classic myalgias (pain) and should have been replaced, but not with Lopid. Replacing Mevacor with Lopid was harmful because Lopid was does not reduce very high LDL levels.

- The "best treatment and indeed obvious treatment" was Lipitor, not these other medications, and there were much more efficacious medications than the ones selected by Dr. Zhang, which should have been "the last medicines of choice." (*Id*. at 49:1-56:9, 58:2-6-72:13.)

- Wexford had a corporate policy of treating cholesterol patients with niacin in addition to prescription drugs. Niacin therapy was an ineffective treatment for McDonald's high cholesterol and should not have been prescribed for him because it was not only ineffective but also harmful due to the side effects he experienced and his prior documented hyperglycemia.

- Dr. Zhang "basically ignored" McDonald's continued back pain and McDonald should have received physical therapy. (*Id.* at 56:17-21.)

- Both Dr. Ghosh and Dr. Zhang violated the standard of care in handling McDonald's grievance complaining about the treatment provided for his cholesterol and back issues.

## II. LEGAL STANDARD

Summary judgment is appropriate when the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Smith v. Hope Sch.*, 560 F.3d 694, 699 (7th Cir. 2009). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court ruling on the motion construes all facts and makes all reasonable inferences in the light most favorable to the nonmoving party. *Id.*

## III. MCDONALD'S MOTION TO STRIKE

Defense expert Scott Kale, M.D. is featured for the first time in the defendants' reply in support of their motion for summary judgment. For purposes of the defendants' motion for summary judgment, McDonald seeks to strike the defendants' arguments in reply relating to Dr. Kale's opinion, as well as Dr. Kale's expert report and his deposition, both which are attached to the reply. Alternatively, McDonald seeks leave to file a *Daubert* motion directed at, among other things, Dr. Kale's opinion that high cholesterol levels are not harmful. *See* Kale Dep., Dkt. 183-1, at 20:11-18 ("The general notion that cholesterol is a harmful molecule is one which is acknowledged by the medical profession to be true. In fact, it's based upon very shoddy evidence that that's the case.").

The defendants concede that their "documentation in support [of their summary judgment motion] did not include the deposition, or the written report, of their expert physician, Dr. Scott Kale." (Dfs.' Reply, Dkt. 192, at 2.) They nevertheless assert that Dr. Kale's opinions respond to Dr. Rizzo's opinions and thus can be properly raised in reply. This is incorrect.

It is well established that the moving party bears "the initial burden of identifying the basis for seeking summary judgment." *Costello v. Grundon*, 651 F.3d 614, 635 (7th Cir. 2011). That party is limited to the grounds it chooses to raise in his opening memorandum and may not expand those grounds in reply. *Id.* This case is about deliberate indifference. Dr. Kale's opinions support the defendants' contention that McDonald received constitutionally adequate care. Dr. Rizzo did not somehow interject this new issue in McDonald's response, thereby opening the door to responsive citations to Dr. Kale's opinion or deposition testimony. If Dr. Kale believed that Dr. Rizzo's opinion regarding constitutionally adequate treatment was merely one of multiple appropriate options (*see* Dr. Kale's report, Dkt. 184-1, at p. 5), the time to say this was in the defendants' opening submissions, not in reply. *See Fromer v. Corizon, Inc.*, 54 F. Supp. 3d 1012, 1033 n.16 (S.D. Ind. 2014) (holding that it is generally improper for a defendant to rely on expert reports for the first time in its reply supporting its motion for summary judgment).

Moreover, this situation is of the defendants' own making. Their opening brief is largely generic and could apply to many prisoners claiming deliberate indifference based on allegedly inadequate medical care. For example, Dr. Ghosh argues, in general terms, that he was Stateville's Medical Director and thus was not personally responsible for McDonald's medical care. The defendants also discuss the basic principle that a prisoner is not entitled to demand the

treatment of his choice. The parties began to engage with all of the specific facts of *this* case only when McDonald filed his response memorandum and statement of additional facts. The defendants waited too late to attempt to offer Dr. Kale's opinion. They may not do so in reply. The motion to strike is granted.

### IV. THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

McDonald alleges that the defendants failed to care for his chronic high cholesterol properly, causing him to experience painful side effects coupled with a countervailing therapeutic benefit that was clearly inadequate. He contends that they were motivated, at least in part, by a desire to reduce costs, including a corporate preference for prescribing cheaper and substandard drugs or over-the-counter supplements instead of Lipitor (atorvastatin), the "non formulary" drug that he needed to address his high LDL cholesterol. He also alleges that Wexford failed to treat his degenerative disc disease appropriately.[5]

In the defendants' motion for summary judgment, Wexford asserts that no evidence shows that it had a policy of providing constitutionally inadequate care for inmates with hyperlipidemia or that it failed to supervise its physicians appropriately. Dr. Ghosh argues that he did not personally treat McDonald. Both Dr. Ghosh (as a fall-back to his argument that he did not provide medical care for McDonald) and Dr. Zhang argue that their choice of treatments was based on medical judgment and that a difference of opinion is not enough to show deliberate indifference.

---

[5] Recruited counsel did not seek leave to file a second amended complaint. McDonald's pro se amended complaint is, therefore, the operative complaint. Counsel challenges the care provided for McDonald's cholesterol and back issues. The court will thus not consider the other conditions that McDonald references in the amended complaint.

## A. Standard for Deliberate Indifference Claims

Correctional officials may not act with deliberate indifference to an inmate's serious medical needs. *See, e.g., Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Pittman ex rel. Hamilton v. Cnty. of Madison, Ill.*, 746 F.3d 766, 775 (7th Cir. 2014). Deliberate indifference has an objective and a subjective element: the inmate must have an objectively serious medical condition, and the defendant must be subjectively aware of and consciously disregard the inmate's medical need. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). A medical need is objectively serious when "the inmate's condition has been diagnosed by a physician as mandating treatment or is so obvious that even a lay person would perceive the need for a doctor's attention." *Gomez v. Randle*, 680 F.3d 859, 865 (7th Cir. 2012) (quoting *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011)). With respect to the subjective component of the deliberate indifference test, a plaintiff must allege that the defendant in question was aware of and consciously disregarded his medical need. *See Farmer*, 511 U.S. at 837; *Estelle*, 429 U.S. at 103-04. "This subjective standard requires more than negligence and it approaches intentional wrongdoing." *Holloway v. Delaware Cnty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012). Here, the subjective prong is at issue as the defendants do not contest the objective prong.

## B. Wexford

Wexford cannot be found liable based on the actions of staff it employs, as "[r]espondeat superior liability [which makes employers liable for the actions of employees who are acting within the scope of their employment] does not apply to private corporations under § 1983." *Shields v. Ill. Dep't. of Corr.*, 746 F.3d 782, 789 (7th Cir. 2014). To establish an official policy or custom, a plaintiff "must show that his constitutional injury was caused by (1) the

enforcement of an express policy of [Wexford], (2) a widespread practice that is so permanent and well settled as to constitute a custom or usage with the force of law, or (3) a person with final policymaking authority." *Wragg v. Vill. of Thornton*, 604 F.3d 464, 467-68 (7th Cir. 2007); *see also Shields*, 746 F.3d at 796 (a plaintiff can establish that Wexford is liable under § 1983 by offering "evidence that his injury was caused by a Wexford policy, custom, or practice of deliberate indifference to medical needs, or a series of bad acts that together raise the inference of such a policy."). In addition, a corporation can be liable for a policy or practice of failing to supervise if its failure constitutes deliberate indifference. *See City of Oklahoma City v. Tuttle*, 471 U.S. 808, 820-21 (1985).

With respect to the treatment he received under the Dr. Ghosh/Dr. Zhang regime, McDonald alleges five corporate policies or practices that caused him to receive inappropriate care for his hyperlipidemia and back issues. First, McDonald argues that Dr. Ghosh and Dr. Zhang failed to follow Wexford's written policies for responding to grievances, resulting in a response that Dr. Ghosh admitted was "incompetent." The Seventh Circuit has held that decisions about a single person's care are generally insufficient to show that Wexford had an unconstitutional policy or practice. *See Shields*, 746 F.3d at 795-96 (holding that multiple treatment errors were "isolated incidents" that did "not add up to a pattern of behavior that would support an inference of a custom or policy, as required to find that Wexford as an institution/corporation was deliberately indifferent to [the plaintiff's] needs.").

Here, however, Dr. Zhang testified that Dr. Ghosh directed her to draft responses to grievances, even though it was his responsibility to do so. *See* Zhang Dep., Dkt. 163-3 at 38:10-16) ("To be honest with you, the grievances should be answered by the medical director only,

but Dr. Ghosh wants me to answer. So I answered it. But, actually, should be present[ed] to [the] medical director. I mean, he said I just like help him and what he said and write it and use my name but actually from Dr. Ghosh, this was."). Dr. Zhang's testimony about Dr. Ghosh's involvement in responding to grievances was not limited to his alleged involvement in the preparation of the response to McDonald's grievance.

The Wexford-IDOC contract requires Wexford to provide care that meets medically accepted community standards. Viewing the evidence in the light most favorable to McDonald, a practice of handling healthcare related grievances in an "incompetent" manner does not ensure that inmates at Stateville, such as McDonald, will receive this level of care. Wexford attempts to disclaim all responsibility for the care that McDonald received but "it is clear that some responsibilities remained with Wexford, and that Wexford was, as a practice, not fulfilling those responsibilities." *McDonald v. Ghosh*, No. 09 C 5302, Dkt. 120 at 9 (N.D. Ill. Mar. 25, 2015) (unpublished order) (denying Wexford's motion for summary judgment in a deliberate indifference case involving dental care provided to McDonald at Stateville).

Second, McDonald contends that Wexford's classification of Lipitor as a "non-formulary" drug meant that Wexford refused to make Lipitor generally available to Stateville inmates during the time period at issue in this case.[6] McDonald reasons that Lipitor's absence from the formulary list was directly responsible for the decision to treat his cholesterol with non-efficacious medications such as niacin, which was both ineffective and harmful due to its side effects and his prior documented hyperglycemia.

---

[6] McDonald appears to be currently taking generic Lipitor to address his elevated cholesterol.

The record shows that Wexford had a procedure in place if a doctor believed that a non-formulary drug was medically necessary. Wexford's drug approval override means that the fact that Lipitor was not on the formulary list does not mean that Liptor was unavailable. *See King v. Kramer*, 680 F.3d 1013, 1020-21 (7th Cir. 2012) (holding that "prescription formularies" at correctional institutions are not "*per se* unconstitutional" and "restricted physician access" to certain medications is not necessarily inappropriate).

Nevertheless, McDonald's claim is not solely based on the absence of Lipitor from Wexford's formulary list. Dr. Ghosh – the Medical Director at Stateville – believed that non-formulary drugs were "fancy" and generally did not prescribe them. McDonald has pointed to a Wexford flowchart documenting a plan to treat high cholesterol with a combination of prescription drugs (which did not include the option of Lipitor, a particular type of statin medication) and niacin. The flowchart is consistent with the treatment that McDonald received. Dr. Rizzo opined that the practice summarized in the flowchart was inconsistent with McDonald's medical needs and that niacin was harmful for McDonald. The flowchart supports an inference that Wexford's approved plan for treating hyperlipidemia was the driving force behind the treatment that McDonald received.

The practice at Stateville of avoiding non-formulary medications and Wexford's cholesterol treatment protocol together are enough to allow a reasonable jury to infer that Wexford's practices were the driving force behind the choice of a treatment regime that Dr. Rizzo believed did not comport with a medically accepted standard of care. *See Gray v. Carter*, No. 12 C 244, 2015 WL 1502380, at *9-10 (N.D. Ill. Mar. 27, 2015). In addition, as McDonald notes, a reasonable jury could infer that Wexford did not include Lipitor on the formulary list

and attempted to mandate the use of other medications due to a systemic desire to control costs. These are all questions for a jury that cannot be resolved at the summary judgment stage.

Third, McDonald argues that the failure to refer him to a doctor outside Stateville for physical therapy for his back allows a jury to infer that Wexford was motivated by a desire to reduce costs. A jury might reach this conclusion, but this argument is not evidence demonstrating a widespread custom, policy, or practice of withholding medically mandated outside care.

Fourth, McDonald argues that the record "shows a disturbing pattern and practice of delaying medical treatment to inmates during the Ghosh-Zhang era at Stateville." (Pl.'s Resp., Dkt. 182, at 14.) In support, McDonald points to a 2006 audit of Stateville's medical unit that "revealed significant policy lapses in the medical department." *Watkins v. Ghosh*, No. 11 C 1880, 2014 WL 840949, at *1 (N.D. Ill. Mar. 4, 2014).[7] McDonald contends that the alleged ongoing issues at Stateville are sufficient to allow a jury to infer that Wexford was motivated solely by a desire to contain costs. The defendants contend that evidence of other instances of allegedly improper treatment is inadmissible. The court need not reach this issue now as it has already held that McDonald's claim against Wexford survives summary judgment.

In the interests of completeness, this leaves McDonald's final argument: that Wexford's policy of using niacin to treat patients with high cholesterol was responsible for severe side effects and the Hobson's choice of taking niacin and enduring its side effects or telling his

---

[7] McDonald does not address the lengthy "Final Report of the Court Appointed Expert" in *Lippert v. Godinez*, 10 C 4603, Dkt. 339 (N.D. Ill. May 19, 2015), as this report addressing medical care at IDOC facilities, including Stateville, was filed after the defendants' summary judgment motion was fully briefed.

doctors he could not tolerate niacin and being written up for "noncompliance." Clearly, Wexford approved of the use of niacin, since it is included in the treatment flowchart for hyperlipidemia. Although Wexford argues that using niacin does not show that its polices regarding the treatment of hyperlipidemia were aimed at cutting costs, a jury could find to the contrary given Dr. Rizzo's opinions about the use of niacin. For all of these reasons, Wexford's motion for summary judgment is denied.

**C.    Dr. Ghosh and Dr. Zhang**

   **1.    Dr. Ghosh – Did He Treat McDonald?**

"[I]ndividual liability under § 1983 requires personal involvement in the alleged constitutional deprivation." *Minix v. Canarecci*, 597 F.3d 824, 833-34 (7th Cir. 2010) (internal quotations omitted). The court has studied the record carefully. Dr. Ghosh's motion for summary judgment creates a sense of altered reality. He argues that McDonald has offered "no evidence of any kind to suggest that Dr. Ghosh responded to the grievance in question." (Defs.' Reply, Dkt. 184, at 10.) But Dr. Zhang testified at her deposition that Dr. Ghosh told her what to write in the response to McDonald's grievance about his cholesterol and back issues.

Dr. Ghosh asserts that he "[d]id not ever personally treat [McDonald] for any medical condition at any time, and was never directly involved with [McDonald's] medical management." (Defs.' Memo., Dkt. 167, at 12.) But some of McDonald's laboratory reports – including test results documenting his LDL levels – identify Dr. Ghosh as the ordering physician. And Dr. Ghosh reviewed and signed a radiologist's x-ray report stating that McDonald had atherosclerosis of the aorta and a narrowing of the L5-S1 disc space, indicating degenerative disc disease. Moreover, McDonald asserts that he complained about his care when

he encountered Dr. Ghosh in a hallway at Stateville. Dr. Ghosh can contest his involvement at trial, but the record here supports an inference that Dr. Ghosh was personally involved with McDonald's care and had the authority to control the care that McDonald received if he had chosen to do so. *See Garner v. Shah*, No. 12-CV-3318, 2013 WL 145038, at *2 (C.D. Ill. Jan. 11, 2013) ("in order to hold the IDOC Medical Director liable, Plaintiff must show that the Medical Director was personally responsible for depriving Plaintiff of medical care and has the authority to direct Plaintiff's current treatment.").

### 2. Treatment Provided by Dr. Ghosh and Dr. Zhang

A medical professional is "entitled to deference in treatment decisions unless no minimally competent professional would have so responded under the circumstances" at issue. *McGee v. Adams*, 721 F.3d 474, 481 (7th Cir. 2103) (internal quotations omitted). Moreover, an inmate's disagreement with a treater's exercise of judgment is generally insufficient to establish deliberate indifference. *Williams v. Health Prof'ls, Ltd.*, No. 10-CV-152-JPS, 2012 WL 666787, at *7 (E.D. Wis. Feb. 29, 2012). Thus, a medical professional acts with deliberate indifference only if his decision "is such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible did not actually base the decision on such a judgment." *Sain v. Wood*, 512 F.3d 886, 894-95 (7th Cir. 2008).

Deliberate indifference is comparable to criminal recklessness. *Farmer*, 511 U.S. at 837. It encompasses conduct such as the refusal to provide effective treatment, *see Fields v. Smith*, 653 F.3d 550, 556 (7th Cir. 2011), or erroneous treatment based on a substantial departure from accepted medical judgment, practice, or standards, *see Roe*, 631 F.3d at 857. The Constitution does not require a prisoner to receive "unqualified access to health care." *Johnson v. Doughty*,

433 F.3d 1001, 1013 (7th Cir. 2006) (quoting *Hudson v. McMillian*, 503 U.S. 1, 9 (1992)). Instead, he is entitled to receive adequate medical care. *Id*.

The defendants argue vigorously that McDonald simply disagrees with the course of treatment provided at Stateville. Dr. Ghosh himself, however, characterized the response to McDonald's grievance complaining about that care as "incompetent." A jury will have to decide if the response was constitutionally sufficient. It will also have to decide if the response's reference to McDonald's "hyper lapidarian" that was allegedly prepared by Dr. Zhang at Dr. Ghosh's behest was grossly subpar (McDonald) or a harmless typographical error (the defendants).

Dr. Zhang responded to McDonald's complaints about the side effects of niacin by writing him up for non-compliance with his prescribed medication, forcing him to choose between discipline and what he characterized as severe, painful side effects. Dr. Ghosh believed that non-formulary medications were "fancy" and generally avoided prescribing them; a jury could find that he followed this practice even if the formulary options were medically inappropriate. Dr. Rizzo has articulated serious and colorable concerns about the medications prescribed for McDonald's hyperlipidemia, including the use of niacin, as well as the lack of treatment provided for McDonald's back condition. Based on those concerns, Dr. Rizzo opined that the defendants violated the standard of care.

These portions of the record support McDonald's Eighth Amendment claim and are easily sufficient to withstand summary judgment.[8] A jury will have to evaluate whether

---

[8] The court notes that even if Dr. Kale's opinion survived McDonald's planned *Daubert* challenge (an issue that the court need not resolve at this time) and was not presented for the first time in reply, it would not affect the result because it would support the defendants' position,

McDonald's treatment was "so far out of bounds that it was blatantly inappropriate or not even based on medical judgment." *King v. Kramer*, 680 F.3d 1013, 1019 (7th Cir. 2012); *Lloyd v. Fishmen*, No. 09 C 0381, 2011 WL 2560228, at *4 (N.D. Ill. June 28, 2011) (the provision of medical care does not "automatically preclude a deliberate indifference claim if a finder of fact could infer that the care provided was so inadequate as to constitute intentional mistreatment"). The motion for summary judgment as to Dr. Ghosh and Dr. Zhang is denied.

### IV. CONCLUSION

Plaintiff Donald McDonald's motion to strike [186] is granted and the defendants' motion for summary judgment [165] is denied in its entirety. This case is set for status on July 22, 2015 at 9:30 a.m. The parties should be prepared to advise the court regarding the status of any settlement discussions and, if necessary, to set firm trial and related dates.

Date: June 18, 2015                             /s/
                                                Joan B. Gottschall
                                                United States District Judge

---

which is based on an interpretation of the record that is at odds with McDonald's interpretation. A jury, not this court, must choose between the parties' positions.