**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **DONALD LEE McDONALD,** | ) | |
| **Plaintiff,** | ) | **Case No. 09 C 4196** |
| | ) | |
| **v.** | ) | **Judge Joan B. Gottschall** |
| | ) | |
| **WEXFORD HEALTH SOURCES, INC.,** | ) | |
| **PARTHASARATHI GHOSH, M.D., and** | ) | |
| **LIPiNG ZHANG, M.D.,** | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

In this case, plaintiff Donald McDonald, who is proceeding with the assistance of recruited counsel, challenges the care that Stateville Correctional Center provided for his high cholesterol and chronic lower back pain. After the court denied the defendants' motion for summary judgment and set a trial date, the defendants sought leave to reopen expert discovery after learning that their expert, Dr. Scott Kale, had died. Based on Dr. Kale's death, the court struck the trial date and set a briefing schedule on McDonald's promised *Daubert* motion directed at Dr. Kale, reasoning that any new expert's testimony would have to align with Dr. Kale's previously disclosed opinions and that it would be inefficient to procure a new expert before determining if Dr. Kale's opinions were proper. For the following reasons, McDonald's motion to bar Dr. Kale is granted in its entirety.

### I. BACKGROUND

#### A.    The Summary Judgment Ruling

The court assumes familiarity with its opinion denying the defendants' motion for summary judgment. (Dkt. 199.) In sum, McDonald filed a grievance in 2008 complaining that the medications (niacin and gemfibrozil, which is also sold under the brand name Lopid) given

to treat his hyperlipidemia (high cholesterol) were ineffective and had significant side effects, that his low-density lipoprotein ("LDL") cholesterol remained elevated, that he had atherosclerosis of the aorta (a type of heart disease,

http://www.clevelandclinicmeded.com/medicalpubs/

diseasemanagement/cardiology/diseases-of-the-aorta/), and that he was experiencing severe pain in his joints and near his kidneys.[1]  The court found that the evidence cited by McDonald in opposition to the defendants' motion for summary judgment regarding the treatment (or lack thereof) provided for his hyperlipidemia and back pain was "easily sufficient to withstand [the defendants' motion for] summary judgment."  (Dkt. 199 at 18.)

Among other things, the court found that evidence supported McDonald's claim that Wexford Health Services, which provides medical care for Stateville inmates, had a practice of avoiding non-formulary medications and had adopted a cholesterol treatment protocol that Dr. Nicholas Rizzo (McDonald's expert) believed did not comport with the medically accepted standard of care.  The court also found that evidence supported McDonald's contentions that:

> [Wexford physician] Dr. Zhang responded to McDonald's complaints about the side effects of niacin [that had been prescribed for McDonald's hyperlipidemia] by writing him up for non-compliance with his prescribed medication, forcing him to choose between discipline and what he characterized as severe, painful side effects.  [Wexford physician] Dr. Ghosh believed that non-formulary medications were "fancy" and generally avoided prescribing them; a jury could find that he followed this practice even if the formulary options were medically inappropriate.

---

[1]  The pain was, in fact, associated with degenerative disc disease which was diagnosed in 2009.

(*Id.*)  In addition, the court noted that Dr. Rizzo had "articulated serious and colorable concerns about the medications prescribed for McDonald's hyperlipidemia, including the use of niacin, as well as the lack of treatment provided for McDonald's back condition."  (*Id.*)

**B.     Physical Therapy Prescribed to McDonald and Opinions of Wexford Doctors Regarding Treatment for Hyperlipidemia**

The defendants do not dispute that, as noted by McDonald, Wexford's Dr. Ghosh opined that "cholesterol lowering medication should be prescribed if you have atherosclerosis."  (Ghosh Dep., Dkt. 166-2, at 27.)  They also do not dispute that Dr. Arthur Funk, Wexford's designated corporate representative, testified at his deposition that elevated LDL cholesterol levels increase the risk for heart attack and stroke.  And they do not dispute that Dr. Ghosh and Dr. Zhang (who was primarily responsible for McDonald's care during her time at Stateville) did not ensure that McDonald received physical therapy for his back pain, which was linked to degenerative disc disease that was diagnosed in March 2009.  Instead, McDonald began physical therapy in late 2012, after Dr. Ghosh and Dr. Zhang left Wexford.

**C.     Dr. Kale's Expert Report**

Dr. Kale received his medical degree in 1976 and was board certified in internal medicine in 1980.  (Dkt. 223-3, Kale Curriculum Vitae.)  During his deposition, Dr. Kale testified that in September 2011, he "became sick" and "was unable to continuing seeing patients," was on "paid disability," and that "since 2012 or so," after he "recovered enough to start reading again, [he] started reviewing medical records" and reinstated his practice of serving as an expert witness. (Dkt., 223-2, Kale Dep., at 14-15.)

Dr. Kale did not examine McDonald.  Instead, he formulated his opinion based on a review of records: the amended complaint and answer, McDonald's deposition transcript and

exhibits, transcripts and exhibits from depositions of Wexford physicians (Dr. Arthur Funk, Dr. Liping Zhang, and Dr. Parthasarathi Ghosh), the transcript and exhibits from the deposition of McDonald's expert, Dr. Rizzo, McDonald's medical records through May 13, 2014, and "selected portions of the 2008 and 2009 corporate preferred drug list." (Dkt. 223-1, Kale Expert Report, at 1.) Focusing on McDonald's hyperlipidemia and back pain,[2] Dr. Kale opines in his report[3] that:

- McDonald's back pain dating back to 2009 was "mild" and "related to weight lifting exercises and not to medications" because a kidney ultrasound and blood work showed "that he had completely normal kidney function";

- Wexford doctors "responded appropriately" to McDonald's complaints of "subjective low back pain with appropriate medical remedies of analgesia, which he sometimes took and sometimes did not, as well as providing recommendations for reasonable physical therapy";

-------

[2] Dr. Kale also provided opinions about the treatment McDonald received for other conditions challenged by McDonald in his pro se filings. McDonald, through recruited counsel, states it "should have [been] plain that the only medical conditions at issue in this case concern [McDonald's] chronic high cholesterol/atherosclerosis and spinal disease." (Pl.'s Reply, Dkt. 225, at 10.) In light of this express clarification, which is consistent with the position taken previously by McDonald's counsel, Dr. Kale's opinions about other medical conditions are excluded because they are irrelevant and will be confusing to a jury.

[3] In addition to Dr. Kale's report, McDonald points to a December 2012 *StreetWise* article purportedly authored by Dr. Kale that denounces "MRI scans of the back or neck," "epidural steroid injections of the cervical and lumbar spine," and spinal fusion surgery as examples of the "current snake oil offerings" that physicians prescribe to patients. (Dkt. 223-6.) The court will not consider this article as the recitation of Dr. Kale's alleged statements is inadmissible hearsay. *See Taylor v. City of Chicago*, No. 14 C 737, 2015 WL 6561437, at *12 (N.D. Ill. Oct. 29, 2015) (citing *Mayor of Philadelphia v. Educ. Equality League*, 415 U.S. 605, 617-18 & n.15 (1974)). Similarly, because they are not supported by record evidence, the court will not consider McDonald's counsel's statements that a July 2015 MRI showed that McDonald "had severe spinal stenosis" that "Wexford later treated with epidural steroid injections and prescription peristeroids and Tylenol-3, as well as with a back brace" and that in February 2016, an orthopedic doctor advised McDonald that he needed spinal fusion surgery. (Dkt. 223, Pl.'s Mot. to Bar, at 6 n.1.)

- McDonald did not need an MRI or any "special testing" other than an X-ray that he received, or a referral to a specialist because "[h]e had no neurologic signs or symptoms that would have justified" further tests or treatment;

- "no evidence" suggests that Wexford created or condoned any policy, practice or custom that caused McDonald to receive inadequate medical care;

- Stateville Medical Director Dr. Ghosh did not violate the standard of care and "Dr. Rizzo's opinion that Dr. Ghosh refused to address plaintiff's medical concerns, or that he improperly dealt with plaintiff's grievances, is unfounded" because in Dr. Kale's opinion, "to the extent of his limited involvement, Dr. Ghosh did not deviate from the standard of care, and exercised prudent medical judgment";

- Dr. Zhang's treatment of McDonald's hyperlipidemia and chronic back pain and the medication she prescribed were "within the standard of care" and an exercise of reasonable medical judgment; and

- "Dr. Rizzo's opinions concerning [McDonald's] resulting side effects as a result of Dr. Zhang's medical decisions are pure speculation on his part," Dr. Rizzo's opinions criticizing the care provided to McDonald "are simply differences in medical judgment rather than quality and intensity of the care that was required by [McDonald] in relation to the many complaints that [McDonald] made," and Dr. Rizzo's "conclusion that any harm resulted from these differences in judgement [sic] . . . is purely and utterly speculative."

(*Id*. at 3.)

**D.     Dr. Kale's Deposition Testimony**

**1.     Dr. Kale's Testimony About McDonald's Hyperlipidemia**

At his deposition, Dr. Kale stated (among other things) that he did not recall being aware that McDonald experienced any "unwelcome side effects" from medications prescribed by Dr. Zhang. (Kale Dep., Dkt. 223-2, at 19.) He also testified that while McDonald suffered from myalgia after he started taking niacin, niacin does not cause "aches and pains." (*Id*. at 24, 29.)

Dr. Kale opined that "any level of cholesterol" could be characterized "as mild, high, [or] moderate." (*Id*. at 20.) He also testified that the importance of treating hyperlipidemia by

"simply giving a drug because there's high cholesterol" is "less clear" than treating high

cholesterol if there are "associated risk factors." (*Id*. at 20-21.) Dr. Kale stated that there is "no

urgency" to treat LDL cholesterol that is over 300, even for patients diagnosed with

atherosclerosis of the aorta, and that LDL levels exceeding 300 do not require cholesterol-

lowering medication. (*Id*. at 22-23.) In support, he explained that "[t]he general notion that

cholesterol is a harmful molecule is one which is generally acknowledged by the medical

profession to be true. In fact, it's based upon very shoddy evidence that that's the case." (*Id*. at

20-21.) Instead, according to Dr. Kale, no "empirical" evidence links high cholesterol to

atherosclerosis of the aorta as "the data is not really established one way or the other" so there is

no need to reduce elevated cholesterol levels in a patient with atherosclerosis. (*Id*. at 21.)

Dr. Kale also referenced a study performed by "the people who make Crestor" (a statin

medication like Lipitor, which McDonald took before being placed into IDOC custody and is

currently taking).[4] (*Id*. at 22.) Dr. Kale testified that the study shows that Crestor "did not

reduce heart attacks or strokes compared to a group of similarly situated people with the same

amount of atherosclerosis who were not getting the drug. So while you can make a chemical

change or at least an image change with a drug like Crestor, you can't demonstrate that there is a

clinical benefit." (*Id*. at 22.) It is possible to "treat 200 people for 2 years with the drug to get

---

[4] The defendants do not challenge McDonald's assertion that neither Dr. Kale nor
defendants' counsel ever gave McDonald's counsel a copy of the Crestor study referenced by
Dr. Kale. *See* Fed. R. Civ. R. 26(a)(2)(B) and (e)(2); *see also* Dkt. 223-5 (Kale Dep. Notice)
(requiring Dr. Kale to bring any documents that he "relies upon in support of opinions he plans
to offer at the time of deposition or trial" to his deposition). And although the defendants state
that Dr. Kale "perhaps" also relied on "a study concerning Lipitor," Dkt. 224, Defs.' Resp., at
13, they do not appear to have turned over any materials relating to the alleged Lipitor study
either.

one benefit." (*Id*. at 23.) So "199 people are getting this [statin] drug and getting no benefit . . . . [b]ut 30 to 40 percent of them are getting significant side effects," including "possible cancer" and a higher risk of diabetes, infertility, and dementia. (*Id*.)

When asked about McDonald's 2008 grievance, Dr. Kale acknowledged that McDonald stated that his cholesterol was over 300, that he experienced pain after he started taking niacin, that he did not experience pain when he previously took Lipitor, and that he had atherosclerosis of the aorta. Dr. Kale did not agree with Dr. Ghosh that Dr. Zhang's handling of the grievance was "incompetent" but agreed that Dr. Zhang's response was incomplete. (*Id*. at 27-28.) Although Dr. Kale did not know if niacin reduced McDonald's cholesterol levels, he believed niacin was "responsive to the question of whether or not [McDonald] had a drug that would lower his cholesterol. He did." (*Id*. at 29-30.)

### 2. Dr. Kale's Testimony About McDonald's Back Issues

Dr. Kale agreed that Dr. Ghosh diagnosed McDonald with degenerative disc disease based on a March 2009 X-ray. Dr. Kale testified that Wexford staff treated McDonald's back pain with nonsteroidal anti-inflammatory drugs such as Tylenol and Motrin, which "[s]ometimes" were effective and "[s]ometimes not." (*Id*. at 30.) Dr. Kale opined that analgesics and "reasonable physical therapy" were appropriate treatments for McDonald's back pain (Dkt. 223-1, Kale Expert Report, at 3), but was unaware that McDonald had not received physical therapy when he was under the care of Dr. Zhang and Dr. Ghosh (Kale Dep., Dkt. 223-2, at 32-33.) Dr. Kale was also unaware that the doctor who replaced Dr. Zhang and Dr. Ghosh prescribed physical therapy that McDonald received, as well as prescription anti-inflammatory medication, "stronger painkillers[,] and muscle relaxants." (*Id*. at 32-33.)

## II.  LEGAL STANDARD

Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), govern the admissibility of expert testimony in federal court.  *See Naeem v. McKesson Drug Co.*, 444 F.3d 593, 607 (7th Cir. 2006).  Rule 702 provides that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

Under *Daubert*, this court must function as a "gatekeeper" to "ensure the reliability and relevancy of expert testimony."  *Naeem*, 444 F.3d 607 (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999)).  "To do so, the district court must ascertain whether the expert is qualified, whether his or her methodology is scientifically reliable, and whether the testimony will 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 893 (7th Cir. 2011) (quoting Fed. R. Evid. 702)).  The court must also determine if an expert is offering legal conclusions, as "experts cannot make those."  *See United States v. Diekhoff*, 535 F.3d 611, 619 (7th Cir. 2008).

## III.  DISCUSSION

### A.    Dr. Kale's Opinions About McDonald's Hyperlipidemia

McDonald argues that Dr. Kale's testimony should be excluded because (1) it is conjecture that is contrary to well-settled medical authority, (2) the *Daubert* factors of testing, publication, standards, and general acceptance in the relevant medical community weigh against

admission, (3) Dr. Kale is not qualified to opine about the applicable standard of care, and (4) Dr. Kale's opinions would confuse rather than assist the jury.

In response, the defendants contend that McDonald's motion to bar is "based primarily on defense [sic] counsel's inaccurate portrayal of Dr. Kale's testimony concerning his view of the relationship between high cholesterol, heart attack and stroke, and the appropriate treatment of aortic atherosclerosis." (Defs.' Resp., Dkt. 224, at 1.) They concede that Dr. Kale did not specify the methodology underlying his opinions, stating that "such opinions were never offered by Dr. Kale in his expert report, and were elicited only during his deposition, in response to limited questioning by plaintiff's counsel." (*Id*. at 2 (emphasis in original).) According to the defendants, the fact that McDonald's counsel asked Dr. Kale about his opinions during his deposition excuses Dr. Kale's inability to provide a detailed explanation of the basis for those opinions since "without prior knowledge of the specific questions posed to him, Dr. Kale could only describe in general the scientific basis for his deposition testimony at that time." (*Id*.) The defendants conclude by arguing that due to Dr. Kale's death, they "are now thwarted in their effort to provide further information concerning the specific scientific methodology upon which he relied, or to present Dr. Kale for any potential *Daubert* hearing, in order to clarify the scientific basis for his opinions" and contend that McDonald's motion is "an attempt to take advantage of Dr. Kale's inability to further explain his deposition testimony, and to attribute specific opinions to him which he never actually expressed." (*Id*.)

1.    **Dr. Kale's Qualifications**

All experts must be qualified to render an opinion. *See*, *e.g.*, *Bielskis*, 663 F.3d at 893. At this time, however, the court will focus on Dr. Kale's opinions, as its present task is to

determine if it is worthwhile to obtain a substitute expert who would testify consistently with Dr. Kale. Any such substitute expert would necessarily have a different background, so any observations about Dr. Kale's specific qualifications would be advisory.

### 2. Dr. Kale's Deposition Testimony

The court has carefully reviewed the transcript of Dr. Kale's deposition (Dkt. 223-2), which contains 29 pages of testimony. Dr. Kale's words during his deposition—summarized above—speak for themselves. The record does not support the defendants' contention that McDonald's motion to bar mischaracterizes Dr. Kale's deposition testimony.

### 3. Dr. Kale's Opinions

This brings the court to McDonald's interrelated contentions that Dr. Kale's opinions are inconsistent with commonly accepted medical authority and fail to satisfy *Daubert*'s standards for the admissibility of expert testimony. Rule 26(a)(2)(B) provides that "if the witness is one retained or specially employed to provide expert testimony in the case," the party offering that witness must provide opposing counsel with a written report containing: "(i) a complete statement of all opinions the witness will express and the basis and reasons for them; (ii) the facts or data considered by the witness in forming them; (iii) any exhibits that will be used to summarize or support them; (iv) the witness's qualifications, including a list of all publications authored in the previous 10 years; (v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and (vi) a statement of the compensation to be paid for the study and testimony in the case." Fed. R. Civ. P. 26(a)(2)(B).

Dr. Kale's report does not include most of this information as it consists of a list of opinions without an explanation of "the basis and reasons for them" or reference to scientific

documents he considered when forming his opinions. The alleged Crestor study, for example, is nowhere to be seen. In addition, the report does not address *Daubert*'s most basic requirements, such as identifying Dr. Kale's methodology and stating whether it can be or has been tested, its known or potential rate of error, and its level of acceptance within the relevant community. *See Gayton v. McCoy*, 593 F.3d 610, 615 (7th Cir. 2010).

Indeed, the only evidence in the record addressing whether Dr. Kale's opinions about treating elevated LDL cholesterol are consistent with generally accepted medical views comes from Dr. Kale himself, who tacitly conceded that his position is an outlier.[5] Specifically, Dr. Kale acknowledged that "[t]he general notion that cholesterol is a harmful molecule is one which is generally acknowledged by the medical profession to be true" but stated that he believed that this position was based on "very shoddy evidence." (Dkt. 223-1, Kale Expert Report, at 20-21.) Dr. Kale does not identify any scientifically reliable methodology, facts, or data that support his view; he simply disagrees with what he describes as the medical profession's general view regarding cholesterol. "[I]t is not enough that the proposed testimony comes from a qualified physician" as even "[a] supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method and are reliable and relevant under the test set forth by the Supreme Court in *Daubert*." *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009) (citing *Clark v. Takata Corp.*, 192 F.3d 750, 759 n. 5 (7th Cir.1999)). Dr. Kale has failed to satisfy this standard.

---

[5]   The court, of course, makes no determination as to the correctness of Dr. Kale's opinions as this task is well beyond the court's expertise and the scope of the record. Instead, the court's task is to evaluate whether his opinions are supported as required by *Daubert*.

On a related note, McDonald 's motion to bar includes citations to National Institute of Health documents, sealed Wexford documents regarding the treatment of hyperlipidemia, and information from the Mayo Clinic, the American Heart Association, and the Cleveland Clinic about risks associated with hyperlipidemia. These materials are all at odds with Dr. Kale's opinions about the treatment of hyperlipidemia. In their response to the motion to bar, the defendants do not comment on these documents. Instead, they ask for time to retain a new expert, arguing that Dr. Kale's death makes it impossible to establish the basis for his opinions in a *Daubert* hearing.

"Death of an expert witness falls squarely within the category of circumstances that require a late disclosure; the only question regarding justification is whether the party waited too long" to advise the court and opposing counsel of the need for a substitute expert. *Morel v. Daimler-Chrysler Corp.*, 259 F.R.D. 17, 20 (D.P.R. 2009). Here, the defendants notified the court and McDonald's counsel promptly after learning of Dr. Kale's death. Determining how to address his death, however, is not as simple as the defendants' suggestion of allowing them to retain a new expert in this 2009 prisoner civil rights case where expert discovery closed before Dr. Kale died.

Courts confronted with an expert who dies before trial have allowed a substitute expert to issue a new report that falls "within the scope of the original expert's report, address[es] the same subject matter, and utilize[s] the same theories of liability in damages" or expresses the original expert's "opinions in their own language . . . . provided they address the same subject matter without meaningful change." *Abbott v. Lockheed Martin Corp.*, No. 06-CV-0701-MJR-DGW, 2014 WL 6613148, at *1 (S.D. Ill. Nov. 21, 2014); *see also Park v.*

*CAS Enterprises, Inc.*, No. CIV. 08CV385DMSNLS, 2009 WL 4057888, at *2-3 (S.D. Cal. Nov. 19, 2009) (allowing the plaintiff to substitute a new damages expert conditioned on the expert's adoption of "the initial and rebuttal expert reports [of the original expert] in their entirety" because "[i]t would be both prejudicial and unduly burdensome to . . . allow submission of new expert reports with new theories and opinions" and to allow the plaintiff to "prepare new expert reports after having had the benefit of [the defendants'] expert reports.").

As the defendants stress, Dr. Kale's death makes it impossible for him to shed further light on the basis for his opinions. Regardless, Dr. Kale's opinions about the treatment provided for McDonald's hyperlipidemia do not present a close question under *Daubert* as when he was alive and expert discovery was open, Dr. Kale could and should have elucidated the basis of his opinions in both his expert report and during his deposition.[6]

The defendants have given McDonald an expert report that fails to comply with Rule 26(a)(2)(B). The report also contains unsupported opinions that conflict with (1) what Dr. Kale agreed were generally accepted views about treating hyperlipidemia, (2) Wexford documents about treating hyperlipidemia, (3) Dr. Ghosh's opinion that cholesterol lowering medication is appropriate for individuals diagnosed with atherosclerosis, and (4) Dr. Funk's opinion that elevated LDL cholesterol levels increase the risk for heart attack and stroke. Relatedly, the defendants agree that Dr. Kale's report does not specify the methodology underlying his opinions and that the only information about the foundation for his opinions was in response to questioning by McDonald's counsel during Dr. Kale's deposition. They then present the novel

---

[6] McDonald's counsel questioned Dr. Kale about this subject. Defense counsel did not ask Dr. Kale any questions at all during his deposition. (Kale Dep., Dkt. 223-2, at 33.)

argument that it is acceptable for Dr. Kale to be unable to provide a detailed explanation for the basis for his opinions during his deposition because he did not know what questions he would be asked, and contend that they should be allowed to cure these delicts by requesting a *Daubert* hearing.

This is not how expert discovery works. If accepted, the defendants' position would obviate the need to provide an expert report as required by Rule 26(a)(2)(B), spend time and money taking an expert deposition, or set an expert discovery cutoff. What is the point, if the party offering the expert can start over shortly before trial by simply requesting a *Daubert* hearing? This is not the law, as there is no automatic right to a *Daubert* hearing. *Suchanek v. Sturm Foods, Inc.*, 311 F.R.D. 239, 244 (S.D. Ill. 2015) (collecting cases). Instead, the court can summarily resolve a *Daubert* motion "where reliability is clear" and there is no genuine question as to admissibility under Rule 702. 29 C. Wright & V. Gold, Federal Practice & Procedure § 6270 (2d ed.); *see also Boyer v. Weyerhaeuser Co.*, No. 12-CV-899-WMC, 2015 WL 6869334, at *2 n.4 (W.D. Wis. Nov. 9, 2015) (a party whose challenge to the testimony of the plaintiffs' experts could be decided without "the untangling of community and household exposure from occupational exposure" did not have to appear at a *Daubert* hearing that was necessary to resolve this issue as to other defendants).

Moreover, the defendants do not appear to have disclosed the alleged Crestor study and the "study concerning Lipitor" that Dr. Kale "perhaps" relied on (Dkt. 224, Defs.' Resp., at 13) that purportedly support his opinions about the propriety of foregoing drug therapy for individuals with cholesterol levels over 300. "Rule 26(e) requires litigants to supplement expert disclosures 'in a timely manner if the party learns that in some material respect the disclosure or

response is incomplete or incorrect.'" *Sonix Tech. Co. v. Publications Int'l, Ltd.*, No. 13-CV-2082, 2015 WL 8153600, at *4 (N.D. Ill. Dec. 8, 2015) (quoting Fed. R. Civ. P. 26(e)). The duty to supplement under Rule 26(e) requires a retained expert who must submit a report pursuant to Rule 26(a)(2)(B) to supplement "both to information included in the report and . . . information given during the expert's deposition. Any additions or changes to this information must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due." *Id.* (quoting Fed. R. Civ. P. 26(e)(2).

The court may allow a party to supplement its disclosures if the failure to supplement was "substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). "[F]our interrelated factors [are] pertinent to this issue: (1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date." *Id.* (quoting *Ballard v. Zimmer, Inc.*, No. 11 C 6786, 2015 WL 110146, at *5 (N.D. Ill. Jan. 7, 2015)). The defendants do not address any of these factors. Instead, they repeatedly state that they are entitled to a hearing. As discussed above, this is not an appropriate remedy for their expert disclosure failure.

If Dr. Kale were alive, the court would not allow him to start the expert discovery process over by producing supporting documents now or testifying at a *Daubert* hearing inconsistently with his expert disclosure and deposition. The defendants' attempt to excuse Dr. Kale's deposition performance because he did not know the specific questions that McDonald's counsel would ask ahead of time is particularly meritless as the questions appropriately attempted to probe the basis for his opinions. Allowing the defendants to profit from the unfortunate

happenstance of Dr. Kale's death by retaining a new expert would be an improper boon to the defendants, who would have no hyperlipidemia expert if Dr. Kale were alive due to the deficiencies discussed above. Dr. Kale's death does not clear the slate and allow the defendants to find a better expert who can overcome the deficiencies outlined in McDonald's *Daubert* motion. *See Fid. Nat. Fin., Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 308 F.R.D. 649, 653-54 (S.D. Cal. 2015) (rejecting the defendant's request to substitute a new expert after its original expert was incapacitated by illness because the defendant "sought not a true substitute for [the incapacitated expert] but a better one"); *cf. Morel*, 259 F.R.D. at 21 (allowing a substitute expert when, among other things, the other side would "not be surprised by new subject matter or a new theory of liability").

In addition, the court rejects the defendants' fall-back proposal that "Dr. Kale's actual testimony . . . should be made available to the jury, but subject to potential cross-examination and rebuttal by the plaintiff [presumably through a substitute expert who shares Dr. Kale's opinions about hyperlipidemia], rather than being barred in its entirety." (Defs.' Resp., Dkt. 224, at 8.) Cross-examination and rebuttal are not cures for the failure to satisfy *Daubert*'s requirements, as the court must act as a "gatekeeper" and determine if expert testimony is proper before it can be presented to a jury. *See Naeem*, 444 F.3d 607; *Kumho Tire Co., Ltd.*, 526 U.S. at 152.

In sum, the exclusion of Dr. Kale is not, as the defendants suggest, a penalty for his untimely death. Instead, it is a consequence flowing from Dr. Kale's unsubstantiated expert report and his inability to provide necessary information at his deposition. Dr. Kale's testimony regarding hyperlipidemia is excluded in its entirety.

**B.    Dr. Kale's Opinions About McDonald's Back Issues**

As noted, above, Dr . Kale's expert report contains the following opinions about

McDonald's back issues:

- As of 2009, McDonald's back pain was "mild" and "related to weight lifting exercises and not to medications" because a kidney ultrasound and blood work showed "that he had completely normal kidney function";

- Wexford doctors "responded appropriately" to McDonald's complaints of "subjective low back pain" by providing "analgesia" and recommending "reasonable physical therapy";

- McDonald did not need a referral to a specialist, an MRI, or any "special testing" other than the X-ray he received because "[h]e had no neurologic signs or symptoms that would have justified" further tests or treatment;

- Stateville Medical Director Dr. Ghosh "did not deviate from the standard of care, and exercised prudent medical judgment";

- Dr. Zhang's treatment of McDonald's chronic back pain was "within the standard of care" and an exercise of reasonable medical judgment.

(Dkt. 223-1, Kale Expert Report, at 3.)

During Dr. Kale's deposition, he acknowledged that in 2009, Dr. Ghosh diagnosed

McDonald with degenerative disc disease.  (Dkt. 223-2, Kale Dep., at 31.)  He also

acknowledged that he was unaware that McDonald began to receive physical therapy and

medication stronger than Tylenol and Motrin in 2012 under the care of a new Wexford

physician.  (*Id*. at 32-33.)

Like his opinions about McDonald's hyperlipidemia, Dr. Kale's opinions about the

treatment of McDonald's back pain have no discernable foundation in the record and are not

based on any disclosed methodology.  *See Gayton*, 593 F.3d at 615.  Even though he was aware

that McDonald had degenerative disc disease as of 2009, Dr. Kale nevertheless opined, without

any explanation, that McDonald's back pain around that time was "mild" and caused by "weight lifting exercises" because tests showed that McDonald's kidney function was normal. How did Dr. Kale reach the conclusion that McDonald's pain was "mild"? How did he decide that it was caused by weight lifting as opposed to degenerative disc disease? How could McDonald have "no neurologic signs or symptoms" justifying further tests or treatment when he had degenerative disc disease? How can Dr. Ghosh and Dr. Zhang's recommendation that McDonald receive physical therapy be appropriate care when McDonald did not receive the physical therapy they recommended until a new doctor took over his care years later? Are any of these opinions consistent with generally accepted medical practice about treating degenerative disc disease?

The portions of Dr. Kale's expert report and deposition that address McDonald's back pain do not engage with these questions. The defendants argue that Dr. Kale's opinions about McDonald's back condition are nevertheless admissible because "even 'shaky' testimony may be admissible, subject to attack on cross-examination." (Defs.' Resp., Dkt. 224, at 15.) In support, the defendants direct the court's attention to *Bielskis*, 663 F.3d at 894, which holds that "shaky" testimony may be admissible if it is sufficiently reliable.

In *Bielskis*, the Seventh Circuit concluded that the expert testimony at issue was "unreliable, not simply shaky" because no testing supported the expert's hypothesis, the expert's opinion was based on inaccurate data, the expert did not submit any documents demonstrating that the expert's opinion was consistent with the views of the relevant scientific community, and the expert's opinions were conclusory. *Id*. at 894-95 (citing Fed. R. Evid. 702). This decision does not help the defendants. Setting aside whether Dr. Kale is qualified to render opinions

about McDonald's degenerative disc disease (an issue which the court need not reach due to this case's procedural posture), his opinions suffer from all of the flaws identified in *Bielskis*.

"At the end of the day, the only absolute requirements imposed on expert testimony are reliability and relevance." *Dolin v. Smithkline Beecham Corp.*, No. 12 C 6403, 2015 WL 7351678, at *1 (N.D. Ill. Nov. 20, 2015) (quoting *Tucker v. SmithKline Beecham Corp.*, 701 F. Supp. 2d 1040, 1055-56 (S.D. Ind. 2010)). Dr. Kale's opinions about the care provided for McDonald's back condition satisfy neither requirement. *See Fail-Safe, L.L.C. v. A.O. Smith Corp.*, 744 F. Supp. 2d 870, 899 (E.D. Wis. 2010) (excluding expert testimony when no reasonable juror could award the damages suggested by the expert because they were based on "a series of wholly unrealistic assumptions" and a "false premise"). Dr. Kale's testimony regarding the treatment of McDonald's back pain is excluded in its entirety.

## C.    Dr. Kale's Opinions About Treatment by Non-Defendant Providers

Dr. Kale also offered opinions about the propriety of the care provided by individuals who are not named as defendants in this case (LaTanya Williams, a physician's assistant, and Dr. Ronald Schaefer, who replaced Dr. Zhang in and was then replaced by Dr. Anton Dubrick). The defendants contend that these individuals' treatment of McDonald is relevant because Wexford is still in charge of McDonald's care and McDonald has raised a *Monell* claim based on Wexford's customs, policies, and practices regarding the care of inmates with hyperlipidemia and degenerative disc disease.

The court disagrees. Many of Dr. Kale's opinions about Williams and Dr. Schaefer related to care challenged by McDonald in his pro se complaint that is no longer at issue. Moreover, the court has previously held that to the extent that Williams and Dr. Schaefer

provided care for McDonald's elevated cholesterol or back pain, Wexford cannot be found liable based on the actions of its employees under a respondeat superior theory. The defendants do not suggest that either Williams or Dr. Schaefer were policymakers so Dr. Kale's opinions about the care that they provided are not germane. Dr. Kale's testimony about care provided by Williams and Dr. Schaefer are excluded as confusing and unhelpful to the jury.

**D.      Dr. Kale's Opinions About Wexford's Customs, Policies, and Practices**

McDonald contends that Wexford had a custom, policy, and practice of providing an unconstitutional level of care to Stateville inmates with hyperlipidemia and degenerative disc disease. Dr. Kale opined that "[w]ith respect to Wexford Health Sources, Inc., [his] review of the record found no evidence to suggest that it created or condoned any policy, practice or custom, either written or unwritten, which resulted in insufficient or inadequate healthcare to Mr. McDonald." (Dkt. 223-1, Kale Report, ¶ 5.)

This opinion is a legal conclusion, not a proper subject for expert testimony under Rule 702. *Jimenez v. City of Chicago*, 732 F.3d 710, 721 (7th Cir. 2013). With exceptions that are inapplicable here, "an expert may not offer legal opinions." *Id*. An expert's opinion about what constitutes a reasonable professional practice may be admissible. *Id*. at 721-22 ("Expert testimony regarding relevant professional standards can give a jury a baseline to help evaluate whether a defendant's deviations from those standards were merely negligent or were so severe or persistent as to support an inference of intentional or reckless conduct that violated a plaintiff's constitutional rights."). But a bald conclusion that a defendant did not have a custom, policy, or practice that violated an inmate's rights is an unacceptable legal opinion. *See id.*; *see also In re Zimmer Nexgen Knee Implant Products Liab. Litig.*, No. 11 C 5468, 2015 WL

5145546, at *18 (N.D. Ill. Aug. 31, 2015).  The motion to bar Dr. Kale's testimony that Wexford did not have a custom, policy, and practice that caused McDonald to receive "insufficient or inadequate medical care," Dkt. 223-1, Kale Expert Report, at 3, is granted.

## IV. CONCLUSION

For the above reasons, McDonald's Daubert motion directed at Dr. Kale [223] is granted in its entirety and the court will not reopen expert discovery to allow the defendants to retain a new expert.  A status hearing is set for April 22, 2016, at 9:30 a.m. to discuss further proceedings.

Date:  April 7, 2015                                    _____/s/_____
                                                Joan B. Gottschall
/cc                                              United States District Judge